IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| VIRGIL E. DAY, et al., | ) | Civ. No. 05-00649 SOM/BMK |
| | ) | |
| Plaintiffs, | ) | |
| | ) | ORDER DISMISSING ACTION |
| vs. | ) | |
| | ) | |
| HAUNANI APOLIONA, individually and in her official capacity as Chairperson and Trustee of the Office of Hawaiian Affairs, et al., | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

ORDER DISMISSING ACTION

I.        INTRODUCTION AND BACKGROUND FACTS.

        This case involves a challenge to the manner in which the Office of Hawaiian Affairs ("OHA") has been and is spending money.  Plaintiffs Virgil E. Day, Mel Hoomanawanui, Josiah L. Hoohuli, Patrick L. Kahawaiolaa, and Samuel L. Kealoha, Jr., (collectively, "Plaintiffs") claim to be "native Hawaiians," as that term is defined in the Hawaiian Homes Commission Act ("HHCA")," 42 Stat. 108 (1921).[1]  First Amended Complaint ("Complaint") ¶ 4.

_____

        [1] The HHCA defines "native Hawaiians" as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778."  42 Stat. 108; see also Rice v. Cayetano, 528 U.S. 495, 507 (2000) (noting that the HHCA "defined 'native Hawaiians' to include 'any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778'").  In this order, the court uses the term "native Hawaiian" as defined in the HHCA.

Hawaii became a state via the Admission Act, P.L. 86-3 (March 18, 1959), reprinted in 73 Stat. 4, 5.  In the Admission Act, the United States granted the State of Hawaii ("the State") title to all public lands and public property within Hawaii, except for lands that the federal government retained for its own use.  P.L. 86-3, § 5(b), 73 Stat. at 5.  The public lands granted to the State, as well as the proceeds and income derived from those lands, were to be held by the State "as a public trust." Haw. Const. art. XII, § 4; Rice, 528 U.S. at 507-08.

According to the Admission Act, the State is the trustee of that public trust and is obligated to use the trust lands and funds for one or more of five enumerated purposes:

> [1] for the support of the public schools and other public educational institutions,
> [2] for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended,
> [3] for the development of farm and home ownership on as widespread a basis as possible[,] [4] for the making of public improvements, and [5] for the provision of lands for public use.

P.L. 86-3, § 5(f), 73 Stat. at 6.  See also Price v. Akaka, 3 F.3d 1220, 1222 (9th Cir. 1993).  Plaintiffs allege that the State delegated its public trust duties to OHA, which receives 20 percent of all income derived from the trust lands.  Price, 3 F.3d at 1222 ("OHA is funded in part with twenty percent of all income derived from the § 5(f) public trust"); see also Haw. Rev. Stat. § 10-13.5 (1990) ("Twenty per cent of all funds derived

2

from the public land trust . . . shall be expended by [OHA] for the purposes of this chapter."). See Complaint ¶¶ 9-10; see also Price, 3 F.3d at 1222 ("OHA was charged with the responsibility of administering and managing the trust proceeds").  Because OHA is part of the State, the public trust restrictions placed on the State by the Admission Act apply to OHA's use or disposal of trust funds.  Price, 3 F.3d at 1222 (noting that the restrictions in the Admission Act "apply to the use or disposal of the income by OHA").

Plaintiffs filed this action as native Hawaiian beneficiaries of the public trust, claiming that former and current OHA trustees[2] have violated and continue to violate OHA's public trust duties by failing to use trust funds solely "for the betterment of the conditions of native Hawaiians."  Plaintiffs say that OHA has used and continues to use trust funds for the benefit of "Hawaiians" without regard to blood quantum.[3]  See,

_____

[2] Plaintiffs bring this action against former OHA trustees, Defendants Clayton Hee and Charles Ota, in their individual capacities.  Plaintiffs also bring this action against current OHA trustees, Defendants Haunani Apoliona, Rowena Akana, Dante Carpenter, Donald Cataluna, Linda Keawe`ehu Dela Cruz, Collette Y. Pi`ipi`I Machado, Boyd P. Mossman, Oswald Stender, and John D. Waihe`e IV, in their individual and official capacities.  Both the former and current trustees are referred to collectively as "Defendants."

[3] In this order, the court uses the term "Hawaiian" as defined in Haw. Rev. Stat. § 10-2, which uses "Hawaiian" to mean "any descendent of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii."

e.g., Complaint ¶ 11.  Plaintiffs assert that Defendants:
(1) violated their rights under the Admission Act and the Equal
Protection Clause of the Fourteenth Amendment, as those rights
are enforceable under 42 U.S.C. § 1983, by expending trust funds
"without regard to the blood quantum contained in the definition
of native Hawaiians in HHCA" (Counts I and II); and (2) "breached
their duty under the common law of the State of Hawaii and H.R.S.
§ 10-16(c) of fidelity owed to Plaintiffs as 'native Hawaiian'
beneficiaries" (Count III).  As to Counts I through III,
Plaintiffs seek damages against the individual Defendants and
declaratory and injunctive relief against the official
Defendants.

Additionally, Count IV seeks the following declaratory
relief:

> To the extent that . . . judicial decisions
> and statutory and constitutional provisions
> do not clearly establish that all land,
> income and proceeds therefrom, received by
> OHA defendants directly or indirectly from
> the § 5(f) trust must be expended by OHA
> Defendants for the betterment of the
> conditions of native Hawaiians, Plaintiffs
> are entitled to a declaratory judgment
> holding that all land, income and proceeds
> received by OHA Defendants directly or
> indirectly from the § 5(f) trust must be
> expended by OHA defendants for the betterment
> of the conditions of native Hawaiians as
> defined in the [HHCA].

On July 10, 2006, after all parties had moved for
summary judgment, the State sought leave to file an amicus curiae

4

brief, which this court granted on July 26, 2006.  On July 31, 2006, the State filed its amicus curiae brief, arguing for dismissal of Plaintiffs' Admission Act claims on the ground that the Admission Act does not create individual rights enforceable under 42 U.S.C. § 1983.  The State acknowledges, as do Plaintiffs, that the Ninth Circuit has previously held that claims for violation of the public trust created in the Admission Act may be brought under § 1983.  However, the State argues that recent Supreme Court precedent effectively overrules that conclusion.  According to the State, in Gonzaga University v. Doe, 536, U.S. 273, 279 (2002), the Supreme Court clarified that "only rights and remedies created and conferred by 'clear and unambiguous terms' set out by Congress itself are enforceable through § 1983."  The State posits, "When the Admission Act is examined by the 'methodical inquiry' into its 'text and structure' that Gonzaga University expressly requires, this court has to conclude that Congress did not create rights that it intended to have enforced through [a] § 1983 action when it enacted the Admission Act."

     This court agrees with the State.  Because Gonzaga University clarifies that claims for statutory violations may be brought under § 1983 only if the text or legislative history of the statute shows clear and unambiguous congressional intent to create individual rights, and because the Ninth Circuit has

already concluded that neither the text nor the history of the Admission Act indicates such congressional intent, Plaintiffs may not enforce the public trust duties in the Admission Act under § 1983.  This court dismisses those portions of Counts I and II that allege violations of the Admission Act.  The court also dismisses those portions of Counts I and II that concern the Equal Protection Clause.  The court dismisses Count IV to the extent it states a federal claim and declines to exercise supplemental jurisdiction over any remaining state law claim. Accordingly, the court dismisses this action in its entirety.

II.      ANALYSIS.

        A.    The Court Overrules Plaintiffs' Objection to
              Having a Hawaiian Law Clerk Work on This Case.

        At the hearing on this matter, Plaintiffs asked whether a Hawaiian or native Hawaiian law clerk was working on this case. Plaintiffs had noticed that the case docket referred to "kmk." By going from the docket sheet to the Notice of Electronic Filing, one could see that "kmk" referred to Kanoelani M. Kane. Plaintiffs inquired whether that was a reference to a Hawaiian law clerk.  The court explained that Ms. Kane is a law clerk working on this case and is Hawaiian, and that Ms. Kane's father is native Hawaiian.  The court also explained that neither the law clerk nor her father is currently seeking funds or other benefits from OHA, and neither has a present intent to seek benefits from OHA in the future.  The court noted that the court

reporter reporting on the case is also Hawaiian and that the courtroom manager is married to a native Hawaiian and has Hawaiian children.  The court opined that barring Hawaiians and native Hawaiians from working on the case would eliminate a large number of people employed by the court.  It would also eliminate one senior district judge.  Plaintiffs said they were objecting only to the Hawaiian law clerk, alleging that the law clerk has a personal interest in the outcome of this case.  The court overrules Plaintiffs' objection.

"If a clerk has a possible conflict of interest, . . . the clerk . . . must be disqualified." Milgard Tempering, Inc. v. Selas Corp. of Am., 902 F.2d 703, 714 (9th Cir. 1990) (quoting Hunt v. Am. Bank & Trust Co., 783 F.2d 1011, 1016 (11th Cir. 1986) (per curium)).  Canon 3(F) of the Codes of Conduct for Judicial Employees ("Codes of Conduct") governs judicial employees' conflicts of interest.  Canon 3(F)(1) states:

> A judicial employee should avoid conflicts of interest in the performance of official duties.  A conflict of interest arises when a judicial employee knows that he or she (or the spouse, minor child residing in the judicial employee's household, or other close relative of the judicial employee) might be so personally or financially affected by a matter that a reasonable person with knowledge of the relevant facts would question the judicial employee's ability properly to perform official duties in an impartial manner.

Cf. <u>Hamid v. Price Waterhouse</u>, 51 F.3d 1411, 1416 (9th Cir. 1995) ("The test for recusal [of a federal judge] in this circuit is 'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'").

Canon 3(F)(2) also addresses restrictions specific to law clerks:

> A . . . law clerk should not perform any official duties in any matter with respect to which such . . . law clerk knows that:
>
> . . . .
>
> (iii) he or she, individually or as a fiduciary, or the spouse or minor child residing in his or her household, has a financial interest in the subject matter in controversy or in a party to the proceeding;
>
> (iv) he or she, a spouse or a person related to either within the third degree of relationship, or the spouse of such person . . . (C) has an interest that could be substantially affected by the outcome of the proceeding[.]

The following relatives are considered to be "within the third degree of relationship": "parent, child, grandparent, grandchild, great grandparent, great grandchild, brother, sister, aunt, uncle, niece, and nephew." Codes of Conduct n.5. Canon 3(F)(5) additionally states that a law clerk "should inform the appointing judge of any circumstance . . . that might serve as a

basis for disqualification of either the staff member or the judge, in a matter pending before the judge."

Prior to working on this case, the law clerk discussed with the judge assigned to this case the law clerk's status as Hawaiian.  She explained that she resides in the same household as her father and minor niece, both of whom are native Hawaiian. Additionally, the law clerk's sister is Hawaiian, and her grandmother, uncle, and another niece are native Hawaiian, although the law clerk does not reside with them.

Neither the law clerk nor any of her family members mentioned above is currently receiving funds or other benefits from OHA.  None of them is presently applying for or presently intends to seek funds or other benefits from OHA in the future. Therefore, none of them has a present financial interest in the case.  While the law clerk and her family members may be <u>eligible</u> for OHA benefits, no financial benefits are actually flowing to them.  Mere eligibility does not give them a financial interest in the outcome of this case.  Plaintiffs' argument that the law clerk has a financial interest in the case is based on pure speculation that she or her family <u>might</u> one day wish to seek those benefits.

Under Plaintiffs' rationale, a Caucasian judge or law clerk could not work on, say, an affirmative action case, even if one would only speculate that the judge or law clerk might be

affected.  For example, in a case brought by a Caucasian student challenging an affirmative action program at a school, no Caucasian judge or law clerk with a child, under Plaintiffs' reasoning, could work on the case, because the child might become more or less eligible for admission depending on the outcome of the case.  In fact, Plaintiffs' argument might eliminate judges and law clerks of all races with children or with the potential to have children.  Plaintiffs would argue for recusal even if the children had no applications for admission to that school pending and had no present intent to apply.  Similarly, under Plaintiffs' argument, women judges and law clerks of child-bearing age would be barred from working on cases involving abortion issues even if they were not pregnant, simply because they might become eligible or ineligible to do certain things based on the outcome of the case if they ever did become pregnant.  Plaintiffs' argument would, in short, stretch recusal principles out of all recognition and make it impossible for judges and law clerks to perform their jobs.

Because the law clerk and her family have no current interest in the outcome of this case, Plaintiffs' objection arises solely because the law clerk is Hawaiian.  Recusal based solely on race is unwarranted and improper.  Cf. Macdraw, Inc. v. CIT Group Equip. Fin., Inc., 138 F.3d 33, 37 (2d Cir. 1998) ("A suggestion that a judge cannot administer the law fairly because

of the judge's racial and ethnic heritage is extremely serious
and should not be made without a factual foundation going well
beyond the judge's membership in a particular racial or ethnic
group."). Accordingly, the court overrules Plaintiffs'
objection.

      B.   The Court Dismisses Plaintiffs' § 1983 Claims
          Based on the Admission Act.

      The State argues that "this court lacks 28 U.S.C.
§§ 1331 and 1343 jurisdiction to determine the plaintiffs'
Admission Act claims." Amicus Curiae Brief ("Brief") at 1. The
State acknowledges, "Since the Ninth Circuit Court of Appeals'
decision in Keaukaha-Panaewa Community Association v. Hawaiian
Homes Commission, 739 F.2d 1467 (9th Cir. 1984) ("Keaukaha II"),
plaintiffs and other native Hawaiians have been allowed to bring
§ 1983 actions in the federal district court to enforce the
provisions of the Admission Act." Brief at 1. However, in light
of the Supreme Court's decision in Gonzaga University v. Doe, 536
U.S. 273 (2002), the State says:

> There is now a serious question as to whether
> actions for alleged breaches of the public
> trust established in the Admission Act can
> still be brought under § 1983.
>
>     . . . .
>
>     . . . . When the Admission Act is
> examined by the "methodical inquiry" into its
> "text and structure" that Gonzaga University
> expressly requires, this court has to
> conclude that Congress did not create rights
> that it intended to have enforced through [a]

> § 1983 action when it enacted the Admission
> Act.  The Admission Act simply admitted
> Hawaii into the Union . . . , but did not
> give anyone other than the United States the
> right to sue to enforce those directions.
> Congress did not confer individual rights on
> plaintiffs, or anyone else when it enacted
> Hawaii's Admission Act.

Brief at 2, 11-12.  This court agrees that Plaintiffs may not enforce the Admission Act under § 1983.

In determining whether the Admission Act creates individual rights enforceable by Plaintiffs under § 1983, this court first reviews relevant Supreme Court § 1983 jurisprudence.

### 1. Relevant Supreme Court Cases.

In Maine v. Thiboutot, 448 U.S. 1, 4-5 (1980), the Supreme Court recognized for the first time that § 1983 actions may be brought against state actors to enforce rights created by federal statutes.  See Gonzaga Univ., 536 U.S. at 280; Sanchez v. Johnson, 416 F.3d 1051, 1056 (9th Cir. 2005).  The scope of this new remedy available under § 1983 was clarified in Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17, 28 (1981), in which the Court stated that "the remedy announced in Thiboutot was to be applied sparingly and only to statutes in which Congress 'speaks with a clear voice,' and 'unambiguously' creates a 'right secured by the laws of the United States.'"  See Sanchez, 416 F.3d at 1056.

In Blessing v. Freestone, 520 U.S. 329, 340 (1997), "the Court finally provided an analytical framework for courts to

use when evaluating whether or not a statute creates a right enforceable under § 1983." See Sanchez, 416 F.3d at 1056.

Blessing requires courts to consider three factors:

> (1) "Congress must have intended that the provision in question benefit the plaintiff," (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence," and (3) the statute must unambiguously impose a binding obligation on the States.  In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms."

Id. at 1056–57 (internal citations omitted).  Once a plaintiff demonstrates that those factors indicate that a statute confers an individual right, the right is presumptively enforceable by § 1983.  Blessing, 520 U.S. at 341 ("Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983."); see Gonzaga Univ., 536 U.S. at 284 ("Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983.").  That presumption may be rebutted by a showing that Congress "specifically foreclosed a remedy under § 1983." Blessing, 520 U.S. at 341.  "Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983."  Id.; see

13

<u>also</u> <u>Gonzaga Univ.</u>, 536 U.S. at 285 n.4 ("The State's burden is
to demonstrate that Congress shut the door to private enforcement
either expressly, through 'specific evidence from the statute
itself,' or 'impliedly, by creating a comprehensive enforcement
scheme that is incompatible with individual enforcement under
§ 1983.'" (internal citations omitted)).

        In <u>Gonzaga University</u>, 536 U.S. at 282-83, the Supreme
Court again addressed whether a federal statute conferred
individual rights enforceable under § 1983.  After reviewing
relevant cases, the Court noted, "Some language in our opinions
might be read to suggest that something less than an
unambiguously conferred right is enforceable by § 1983."  <u>Id.</u>
at 282.  As an example of seemingly inconsistent language, the
Court cited to the first factor in the <u>Blessing</u> test, which
requires courts to determine whether Congress intended that the
statute "benefit" the plaintiff.  <u>Id.</u>  The Court explained:  "In
the same paragraph, however, <u>Blessing</u> emphasizes that it is only
violations of <u>rights</u>, not <u>laws</u>, which give rise to § 1983
claims."  <u>Id.</u> (emphases in original).  Thus, the Court stated:

            This confusion has led some courts to
            interpret <u>Blessing</u> as allowing plaintiffs to
            enforce a statute under § 1983 so long as the
            plaintiff falls within the general zone of
            interest that the statute is intended to
            protect; something less than what is required
            for a statute to create rights enforceable
            directly from the statute itself under an
            implied private right of action.  Fueling
            this uncertainty is the notion that our

14

> implied private right of action cases have no
> bearing on the standards for discerning
> whether a statute creates rights enforceable
> by § 1983.

Id. at 283.  To clarify, the Court concluded:

> We now reject the notion that our cases
> permit anything short of an unambiguously
> conferred right to support a cause of action
> brought under § 1983.  Section 1983 provides
> a remedy only for the deprivation of "rights,
> privileges, or immunities secured by the
> Constitution and laws" of the United States.
> Accordingly, it is rights, not the broader or
> vaguer "benefits" or "interests," that may be
> enforced under the authority of that section.
> This being so, we further reject the notion
> that our implied right of action cases are
> separate and distinct from our § 1983 cases.
> To the contrary, our implied right of action
> cases should guide the determination of
> whether a statute confers rights enforceable
> under § 1983.

Id. at 283.

The Court then explained that a court must make the

same initial inquiry whether deciding if a private right of

action can be implied from a particular statute or deciding if a

statutory violation may be enforced through § 1983:

> We have recognized that whether a
> statutory violation may be enforced through
> § 1983 "is a different inquiry than that
> involved in determining whether a private
> right of action can be implied from a
> particular statute."  But the inquiries
> overlap in one meaningful respect--in either
> case we must first determine whether Congress
> intended to create a federal right.  Thus we
> have held that "[t]he question whether
> Congress intended to create a private right
> of action is definitively answered in the
> negative" where a "statute by its terms

> grants no private rights to any identifiable class." For a statute to create such private rights, its text must be "phrased in terms of the persons benefitted."

Id. at 283-84 (emphasis in original) (internal citations omitted); see also id. at 285 ("A court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context. Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries."). Thus, the Court held, "In sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms--no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action." Id. at 290.

The foregoing Supreme Court decisions make it clear that, in determining whether Plaintiffs may enforce violations of the Admission Act under § 1983, this court must first determine whether "Congress intended to confer individual rights upon a class of beneficiaries" when it enacted the Admission Act. The Ninth Circuit has already addressed this issue in Keaukaha-Panaewa Community Association v. Hawaiian Homes Commission, 588 F.2d 1216 (9th Cir. 1978) ("Keaukaha I"), and this court turns to a review of that case and other cases.

16

2.   <u>Ninth Circuit Cases.</u>

In <u>Keaukaha I</u>, 588 F.2d at 1219, a group of native

Hawaiian plaintiffs alleged that various state actors "violated

fiduciary obligations imposed upon [them] by sections 4 and 5 of

the Admission Act."   The dispute concerned the State's exchange

of Hawaiian homestead lands for what was supposed to be acreage

of equivalent size, with the homestead lands to be used for

flood-control purposes.   Ultimately, the homestead land required

for the flood-control project was more than double what had been

initially expected, but the lands received in exchange remained

at the original acreage.   The defendants moved to dismiss the

action, which the district court denied after finding federal

question jurisdiction.   <u>Id.</u> at 1220.   The district court then

granted summary judgment to the plaintiffs, ruling that the state

agencies had violated their obligations.   On appeal, the

defendants renewed their jurisdictional arguments.   <u>Id.</u> at 1220.

The Ninth Circuit's "threshold inquiry" was whether the

Admission Act creates a private right of action for enforcement

of its terms.   <u>Id.</u>   After noting that "[t]he Act is silent . . .

on the question of whether suit may be brought by a private

individual to enforce its terms," the Ninth Circuit rephrased the

issue before it as:   "Does the Admission Act create an <u>implied</u>

cause of action by which a private party may enforce the duties

and obligations imposed by the Act?"   <u>Id.</u> (emphasis added).   The

17

court turned to four factors that are "to be examined in determining whether implication of a private right of action is appropriate."  The court restated the factors, previously enunciated by the Supreme Court in <u>Cort v. Ash</u>, 422 U.S. 66, 95 (1975):

> First, is the plaintiff "one of the class for whose Especial benefit the statute was enacted," that is, does the statute create a federal right in favor of the plaintiff?  Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?  Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?  And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

<u>Id.</u> at 1222 (internal citation omitted).

The Ninth Circuit held that the first factor was satisfied, as the trust provisions in the Act were "intended especially to benefit native Hawaiians," and as "plaintiffs are clearly members of this group."  <u>Id.</u> at 1223.

Regarding the second factor, the court stated:

> The second element of the <u>Cort</u> test, "explicit or implicit" legislative intent, cuts against implication of a private cause of action here.  <u>Our review of the legislative history of the Admission Act has not discovered any indication that Congress intended to created [sic] a private cause of action via the Admission Act nor has any such indication been pointed out to us.</u>  <u>See</u>, <u>e.g.</u>, S. Rep. No. 1164, 85th Cong., 1st Sess.

18

14 (1957).  Indeed, the rare references in
the Committee reports to enforcement of
section 5's trust provisions refer
exclusively to the public cause of action.
This does not surprise us, however.  It would
be unusual for Congress to employ a state's
admission act to create private enforcement
rights, and it is inconceivable that Congress
would intend to do so implicitly.

Id. at 1223 (internal citation omitted) (emphasis added).

In addressing the second factor, the court also focused

on the public remedy in the Act, which authorizes the United

States to bring suits for breach of the public trust.  Id. at

1218, 1223.  The court applied the "expressio unius est exclusio

alterius" principle, which states the "presumption that by

providing a specific remedy, Congress intended to exclude

others."  Id. at 1223.  The court stated:

Although the uncertainties of the Cort
decision counsel against heavy reliance on
this presumption, as we explained above, it
remains [a] relevant factor in cases such as
this.  We think the particular history of the
Admission Act renders it most appropriate for
application of the Expressio unius
presumption:

The first Hawaii statehood
bill was introduced in the 65th
Congress in 1919.  Hearings began
25 years ago with those on H.R.
3034, 74th Congress.

Since then, the House and
Senate have held 22 additional
hearings on the subject of
statehood for Hawaii.  The record
on the question comprises more than
6,600 printed pages of testimony
and exhibits.  More than 850

19

witnesses have been heard in the
Territory and in Washington.  Seven
of the hearings have been held in
Hawaii (1935, 1937, 1946, 1948,
1954, and 1958).  In addition, at
least 12 reports have been made.

The question of admitting
Hawaii to statehood has been longer
considered and more thoroughly
studied than any other statehood
proposal that has ever come before
Congress.  Thirty-seven States have
previously been admitted to the
Union by action of Congress, yet in
no single case has there been such
a thoroughly careful study of the
qualifications of the applicant as
in the case of Hawaii.

S. Rep. No. 80, 86th Cong., 1st Sess. (1959),
Reprinted in (1959) U.S. Code Cong. & Admin.
News, pp. 1346, 1349-50.

The Expressio unius principle is based
on a presumption that by providing a specific
remedy, Congress intended to exclude others.
Reason dictates that the more thoroughly a
bill is considered, the greater the
likelihood that the Expressio unius
presumption accurately reflects reality.
Since in this case, the legislative measure
was given protracted consideration, it is
more likely that the lack of an express
private cause of action was intentional.
Given this consideration, and finding no
contrary evidence, the express provision for
the public cause of action permits us . . .
to infer that Congress did not intend to
create a private right of action.

Id. at 1223-24 (emphasis added).

After deciding that the third and fourth factors did

not support finding an implied private right of action under the

Admission Act, the Ninth Circuit concluded that the Cort factors,

including the absence of congressional intent to create a private right of action, "concertedly and decidedly militate against implication of the private enforcement cause of action." Id. at 1224.

In concluding that "Congress did not intend to create a private right of action" under the Act, the Ninth Circuit relied on its review of the text and legislative history of the Admission Act. Keaukaha I, 588 F.2d at 1223-24. Although in Keaukaha I the Ninth Circuit was examining whether there was an implied private right of action under the Admission Act as opposed to whether one could sue under § 1983, the court's "role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context." See Gonzaga Univ., 536 U.S. at 285.  Therefore, the Ninth Circuit's conclusion that Congress did not intend to create an implied private right of action in the Admission Act requires the conclusion that Congress did not intend to confer in that Act individual rights enforceable under § 1983.  See id.

Plaintiffs point to cases decided by the Ninth Circuit after Keaukaha I, in which the court held that "§ 1983 creates a right of action to enforce § 5(f) of the . . . Admission Act." Opp. to Motion for Leave to File Amicus Curiae Brief ("Opp. to Motion") at 2.  Plaintiffs note that the Ninth Circuit reached

this conclusion in <u>Keaukaha II</u>, 739 F.2d at 1472, and <u>Price v. Akaka</u>, 3 F.3d 1220, 1224-25 (9th Cir. 1993).  In those cases, the Ninth Circuit did not consider whether Congress intended to create a private right of action under the Act.  Because the Supreme Court has since clarified that a statutory right is enforceable under § 1983 only upon a showing of congressional intent to create a private right of action, <u>Keaukaha II</u> and <u>Price</u>, both discussed below, are no longer controlling.

The history of the <u>Keaukaha</u> litigation is helpful to an understanding of what the law now requires.  As discussed above, in <u>Keaukaha I</u>, 588 F.2d at 1220, 1224, the Ninth Circuit found no express or implied private right of action under the Admission Act.  After the Supreme Court had denied certiorari but before the district court had entered final judgment in that case, the plaintiffs obtained leave from the district court to amend their complaint to allege a violation of § 1983.  <u>Keaukaha II</u>, 739 F.2d at 1469.  The amended complaint was based on the intervening <u>Thiboutot</u> decision, in which the Court held for the first time that § 1983 encompasses claims for deprivation of rights created purely by federal statute.  <u>Id.</u>  After the district court concluded that "the lack of an implied right of action under the Admission Act precluded a section 1983 cause of action," the plaintiffs appealed.

On appeal, the Ninth Circuit noted, "By deciding [in
Keaukaha I] there was no implied private cause of action, . . .
we did not determine whether a section 1983 cause of action is
available to plaintiffs for deprivation of rights guaranteed
under the Admission Act." Keaukaha II, 739 F.2d at 1470.  The
court noted that Thiboutot recognized a § 1983 cause of action
for violations of federal statutory requirements, but that the
Court's subsequent decision in Middlesex County Sewerage
Authority v. National Sea Clammers Association, 453 U.S. 1
(1981), defined "two 'exceptions to the application of § 1983 to
statutory violations.'" Id. at 1470.  The Ninth Circuit noted
that, after Middlesex County, courts were to consider:
(1) "whether Congress had foreclosed private enforcement of that
statute in the enactment itself", and (2) "whether the statute at
issue . . . was the kind that created enforceable 'rights' under
§ 1983." Id. at 1470.  In analyzing whether violations of the
Admission Act could be enforced under § 1983, the court applied
the two-pronged Middlesex test.

The Ninth Circuit concluded that "the Admission Act
meets the first requirement of the Middlesex test" because the
Act "does not contain a sufficiently comprehensive enforcement
scheme to foreclose a section 1983 remedy." Keaukaha II, 739
F.2d at 1471.  Regarding the second prong--i.e., whether the Act
created a federal right enforceable under section 1983--the Ninth

Circuit noted that the Supreme Court "implied that a right is created when Congress mandates, rather than merely encourages, a specified entitlement." Id. Because the "Admission Act clearly mandate[d] establishment of a trust for the betterment of native Hawaiians" and because the plaintiffs were "members of the class in whose interest the trust was created," the court determined that the second Middlesex question was satisfied. Therefore, the Ninth Circuit held that "the plaintiffs have stated a federal cause of action under 42 U.S.C. § 1983. Id. at 1472.

Keaukaha II was followed by Price, 3 F.3d at 1221, in which the Ninth Circuit reviewed § 1983 claims by native Hawaiian plaintiffs against OHA trustees for allegedly "commingling, managing, administering, and expending trust funds in violation of the Hawaii Admission Act." On appeal, the trustees argued that "§ 1983 claims may not be brought to challenge violations of the Admission Act because the Admission Act does not create a federally enforceable right. Id. at 1224. The Ninth Circuit disagreed, stating:

> The instant case involves a public trust, and under basic trust law principles, beneficiaries have the right to 'maintain a suit (a) to compel the trustee to perform his duties as trustee; (b) to enjoin the trustee from committing a breach of trust; and (c) to compel the trustee to redress a breach of trust." Restatement 2d of the Law of Trusts, § 199; see also id. at § 200, comment a ("Normally a suit against a trustee to enforce the trust or to enjoin or obtain redress for a breach of trust is brought by a

> beneficiary.").  We have accordingly held
> that "allowing Price to enforce § 5(f) is
> consistent with the common law of trusts, in
> which one whose status as a beneficiary
> depends upon the discretion of the trustee
> nevertheless may sue to compel the trustee to
> abide by the terms of the trust." [Price v.
> Akaka, 928 F.2d 824, 826-27 (9ᵗʰ Cir. 1990).]

Id. at 1224-25 (footnote omitted).  Based on that reasoning, the

Ninth Circuit concluded that "Congress enacted the Admission Act,

a federal public trust, which by its nature creates a federally

enforceable right for its beneficiaries to maintain an action

against the trustee in breach of the trust."  Id. at 1225.

     As is evident from the foregoing discussions of

Keaukaha II and Price, the Ninth Circuit did not consider in

those cases whether Congress had intended to create a private

right of action in the Admission Act.  Rather, the court relied

on then-governing Supreme Court law to conclude that the Act

creates individual rights enforceable under § 1983.  Since the

Ninth Circuit last addressed the issue, however, the Supreme

Court has clarified in Gonzaga University, 536 U.S. at 285, that

a court must initially determine "whether or not Congress

intended to confer individual rights upon a class of

beneficiaries."  In that regard, "where the text and structure of

a statute provide no indication that Congress intends to create

new individual rights, there is no basis for a private suit,

whether under § 1983 or under an implied right of action."  Id.

at 286.  The Ninth Circuit's conclusion in Keaukaha I, 588 F.2d

25

at 1223-25, that neither the text nor the legislative history of the Admission Act indicates any congressional intent to create a private right of action requires the conclusion here that the Admission Act confers no individual rights enforceable under § 1983.[4]  See Gonzaga Univ., 536 U.S. at 285-86.

This court recognizes that the foregoing conclusion conflicts directly with pre-Gonzaga Ninth Circuit cases that are directly on point, and that hold that the Admission Act creates rights enforceable through § 1983.  Cf. Price v. State of Hawaii, 939 F.2d 702, 706 (9th Cir. 1991) ("The district court had jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983."); Price v. Akaka, 928 F.2d 824, 828 (9th Cir. 1991) (en banc) ("The source of the right Price asserts here is precisely the same as the source of the right claimed in Keaukaha II, namely, § 5(f) of the Admission Act.  Hence, the right Price asserts also is federal, and § 1983 is available."); Price v. State of Hawaii, 921 F.2d 950, 954 (9th Cir. 1990) ("The district court had jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983."); Ulaleo v. Paty, 902 F.2d 1395, 1397 (9th Cir. 1990) ("In [Keaukaha II], we found that the Admission Act § 5(f),

---

[4] Because this court concludes that the Admission Act fails the first Blessing factor, the court need not consider or address the second and third factors.  See Sanchez, 416 F.3d at 1062 ("Because we hold that § 30(A) fails the first prong of the Blessing test, we do not need to consider the second and third prongs.").

although not encompassing an implied right of action, did allow for a section 1983 action."); <u>Price v. State of Hawaii</u>, 764 F.2d 623, 628 (9th Cir. 1985) ("We have recently held that § 5(f) of the Admission Act creates a federal 'right' enforceable under 42 U.S.C. § 1983." (citing <u>Keaukaha II</u>, 739 F.2d at 1472)).

Plaintiffs assert, "It is not appropriate for this court to reexamine controlling precedent by the Ninth Circuit Court." Supp. Memo at 2. However, the Ninth Circuit itself acknowledges that a prior decision may be "undercut by higher authority to such an extent that it has been effectively overruled by such higher authority and hence is no longer binding on district judges and three-judge panels of this court." <u>Miller v. Gammie</u>, 335 F.3d 889, 899 (9th Cir. 2003); <u>see also</u> <u>id.</u> at 900 ("the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable"). In other words, "circuit precedent, authoritative at the time that it issued, can be effectively overruled by subsequent Supreme Court decisions that 'are closely on point,' even though those decisions do not expressly overrule the prior circuit precedent." <u>Id.</u> at 899 (citing <u>Galbraith v. County of Santa Clara</u>, 307 F.3d 1119, 1123 (9th Cir. 2002)).

The Ninth Circuit cases cited by Plaintiffs did not consider whether Congress intended to create a private right of

action.  After those Ninth Circuit cases were decided, the
Supreme Court in Gonzaga University, made it clear that a court
must examine congressional intent.  Gonzaga University thus
"undercut the theory or reasoning of [those cases] in such a way
that the cases are clearly irreconcilable."  See Miller, 335 F.3d
at 900.  The court concludes that Gonzaga University effectively
overruled those prior Ninth Circuit cases to the extent they
permitted individuals to proceed in the absence of congressional
intent.  See id. at 899.

     Relying on Gonzaga University and Keaukaha I, the court
dismisses those portions of Counts I and II that assert § 1983
claims based on the Admission Act.

     C.   The Court Dismisses Plaintiffs' Equal Protection
          Claims.

     In Counts I and II, Plaintiffs assert that Defendants
have violated or are violating the Equal Protection Clause of the
Fourteenth Amendment by allegedly spending trust funds to lobby
in support of the Akaka Bill.  Plaintiffs describe the Akaka Bill
as a bill "to create a Native Hawaiian Governing Entity to be
established by persons with as little as 1/64th part-Hawaiian all
the way down to one aboriginal Hawaiian ancestor out of 500 or
otherwise by persons of aboriginal Hawaiian ancestry without
regard to the blood quantum requirements set out under
HHCA . . . ."  Complaint ¶¶ 10(a).  Plaintiffs allege, "If the
Akaka Bill is enacted into law without a blood quantum as set

28

forth in the HHCA, Plaintiffs and all other 'native Hawaiian' beneficiaries will be deprived of their right to equal protection under the law guaranteed to them by the Fourteenth Amendment to the United States Constitution." Id. ¶ 18.  The court dismisses Plaintiffs' equal protection claims.

The Equal Protection Clause commands that no state shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike.  High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 570-71 (9th Cir. 1990).  Because Plaintiffs make no allegation that they have been treated differently from similarly situated persons, Plaintiffs fail to properly allege a violation of the Equal Protection Clause.  Therefore, to the extent Counts I and II are based on alleged violations of the Equal Protection Clause, those claims are dismissed.  Having already dismissed other portions of Counts I and II, the court dismisses Counts I and II in their entirety.

D.    The Court Declines to Exercise Supplemental
      Jurisdiction Over the State Law Claims.

With the dismissal of Counts I and II, the only claims remaining are Counts III and IV.  In Count III, Plaintiffs allege that Defendants "breached their duty under the common law of the State of Hawaii and H.R.S. § 10-16(c) of fidelity owed to Plaintiffs as 'native Hawaiian' beneficiaries."  Complaint

29

¶¶ 23-25.  In Count IV, Plaintiffs seek a declaration that OHA must use trust funds solely for the betterment of the conditions of native Hawaiians.  Complaint ¶¶ 26-32.  Construing Counts III and IV as asserting state law claims,[5] the court declines to exercise supplemental jurisdiction over those counts.

Supplemental jurisdiction over state claims exists when a federal claim is sufficiently substantial to confer federal jurisdiction and there is "a common nucleus of operative fact between the state and federal claims."  Brady v. Brown, 51 F.3d 810, 816 (9th Cir. 1995) (citing Gilder v. PGA Tour, Inc., 936 F.2d 417, 421 (9th Cir. 1991)).  When a state law claim arises from a common nucleus of operative fact with a sufficiently substantial federal claim, a district court may nevertheless decline to exercise supplemental jurisdiction over a state law claim if:  (1) the claim raises a novel or complex issue of state law; (2) the state law claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.  28 U.S.C. § 1367.

---

[5] At the hearing on this matter, Plaintiffs' counsel explained that Count IV is rooted in both federal and state law. To the extent that Count IV is an attempt to state a federal claim, the court dismisses it, as Plaintiffs may not enforce the Admission Act under § 1983, as explained above.

Supplemental jurisdiction is a doctrine of discretion, not of a plaintiff's right.  <u>City of Chicago v. Int'l College of Surgeons</u>, 522 U.S. 156, 172 (1997); <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726 (1996).  The Supreme Court has noted that, when "the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  <u>Gibbs</u>, 383 U.S. at 726.  Although the Supreme Court later noted that such a dismissal is not "a mandatory rule to be applied inflexibly in all cases," it also recognized that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims."  <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988).  When a court refuses to exercise its supplemental jurisdiction over state law claims, those claims may be dismissed without prejudice.  <u>Gibbs</u>, 383 U.S. at 726.

All of Plaintiffs' federal claims have been dismissed.  Because the only remaining claims are Counts III and IV, which are based on state law, this court declines to exercise supplemental jurisdiction over those counts.  Accordingly, Counts III and IV are dismissed without prejudice.

31

III.     CONCLUSION.

The court dismisses this action in its entirety. Dismissal renders moot all pending motions.  The Clerk of Court is therefore directed to enter judgment for Defendants and to close this case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 10, 2006.


_Susan Oki Mollway_
Susan Oki Mollway
United States District Judge


**Day, et al. v. Apoliona, et al.**, Civ. No. 05-00649 SOM/BMK; ORDER DISMISSING ACTION.